# 22-1106

# United States Court of Appeals

*for the*

# Fourth Circuit

WILLIAM M. BULGER, Administrator of the
Estate of James Bulger,

*Plaintiff-Appellant,*

– v. –

HUGH HURWITZ, formerly John Doe 1 - ALL OF WHOM ARE EMPLOYEES
OF THE FEDERAL BUREAU OF PRISONS; J. A. KELLER, formerly John Doe
3 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF
PRISONS; ANGELA DUNBAR, formerly Jane Doe 4 - ALL OF WHOM ARE
EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; R. C.
CHEATHAM, formerly John Doe 5 - ALL OF WHOM ARE EMPLOYEES OF
THE FEDERAL BUREAU OF PRISONS; CHARLES LOCKETT, formerly John
Doe 6 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF
PRISONS; JOSEPH COAKLEY, formerly John Doe 7 and 8 - ALL OF WHOM
ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS;

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT MARTINSBURG

## OPENING BRIEF OF APPELLANT

ANTHONY I. WERNER
JOHN & WERNER LAW OFFICES, PLLC
80 12th Street, Suite 200
Wheeling, West Virginia 26003
(304) 233-4380
awerner@johnwernerlaw.com

JAY T. MCCAMIC
MCCAMIC LAW FIRM, PLLC
80 12th Street, Suite 305
Wheeling, West Virginia 26003
(304) 238-9460
jay@mccamic.com

*Counsel for Plaintiff-Appellant*

*(For Continuation of Appearances See Inside Cover)*

CP  COUNSEL PRESS • VA – (804) 648-3664

AMY RUIZ, formerly Jane Doe 9 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JEFFREY SMITH, formerly John Doe 10 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; ALICE PISANESCHI, formerly Jane Doe 11 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JEREMY SHIRK, formerly John Doe 12 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; ANTHONY MORI, formerly John Doe 13 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; BRANDON BOLEDOVIC, formerly John Doe 14 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JOHN/JANE DOE 2, ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JOHN/JANE DOES 15-30, ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; UNITED STATES OF AMERICA,

*Defendants-Appellees.*

L. DANTE' DITRAPANO
SEAN B. SHRIVER
CALWELL LUCE DITRAPANO PLLC
500 Randolph Street
Charleston, West Virginia 25302
(304) 400-6558
dditrapano@cldlaw.com
sshriver@cldlaw.com

*Counsel for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1106__      Caption: __Bulger v. Hurwitz, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__William M. Bulger, Jr., Adminstrator of the Estate of James J. Bulger__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☐ NO
    If yes, identify all such owners:
    N/A

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐ YES ☑ NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐ YES ☑ NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date: 2/17/2022

Counsel for: William M. Bulger

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES.........................................................1

STATEMENT OF THE CASE .............................................................3

SUMMARY OF ARGUMENT ..........................................................10

ARGUMENT ......................................................................................12

    I.     THE STANDARD OF REVIEW .....................................12

    II.    DISCUSSION OF THE ISSUES ....................................12

        A.     Plaintiff's 8th Amendment *Bivens* claims remain viable after *Ziglar v. Abbasi* ..............................................12

            1.     The Abbasi test for *Bivens* expansion ............................12

            2.     There is no "new *Bivens* context" presented by Mr. Bulger's 8th Amendment failure to protect claims because there is no "meaningful difference" between this case and previous 8th Amendment *Bivens* cases decided by the Supreme Court ..............................................14

            3.     Even if the Court were to find that Mr. Bulger's 8th Amendment Claims present a "new *Bivens* context," there are no alternative, existing remedies and no "special factors" that counsel hesitation in creating a Bivens remedy here ..................18

        B.     The Discretionary Function Exception Cannot Shield Every Negligent Act of The Federal Government....................20

        C.     The Court Below Should Have Permitted Discovery Before Dismissing The Claim.................................................24

CONCLUSION ..................................................................................26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Andrulonis v. United States*,
   952 F.2d 652 (2d Cir. 1991) *cert. granted*, *judgment vacated sub nom.*
   in *New York State Dep't of Health v. Andrulonis*, 502 U.S. 801,
   112 S. Ct. 39, 116 L. Ed. 2d 18 (1991), *on reconsideration*,
   952 F.2d 652, 655 (2d Cir. 1991) ................................................................. 22, 23

*Bell v. Wolfish*,
   441 U.S. 520 (1979) ............................................................................................21

*Bistrian v. Levi*,
   912 F.3d 79 (3d Cir. 2018) ......................................................... *passim*

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
   403 U.S. 388, 91 S. Ct. 1999 (1971) .....................................................................1

*Burbach Broadcasting Co. v. Elkins Radio Corp.*,
   278 F.3d 401 (4th Cir. 2002) ...............................................................................12

*Carlson v. Green*,
   446 U.S. 14 (1980) ...................................................................................... 18, 19

*Corr. Servs. Corp. v. Malesko*,
   534 U.S. 61 (2001) ..............................................................................................18

*Coulthurst v. United States*,
   214 F.3d 106 (2nd Cir. 2000) ....................................................................... 11, 23

*Estelle v. Gamble*,
   429 U.S. 97 (1976) ..............................................................................................18

*Evans v. United States*,
   No. 3:15-CV-64 (GROH), 2016 U.S. Dist. LEXIS 119152
   (N.D.W. Va. Sep. 2, 2016) ..................................................................................23

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ................................................................................... *passim*

*Hudson v. McMillian*,
   503 U.S. 1 (1992) ................................................................................................18

*Ignatiev v. United States*,
    238 F.3d 464 (D.C. Cir. 2001)..............................................................24

*Kielwien v. United States*,
    540 F.2d 676 (4th Cir.1976) ...............................................................20

*Little v. United States*,
    Civil Action No. 5:11cv41, 2014 U.S. Dist. LEXIS 114264
    (N.D.W. Va. Aug. 1, 2014) ................................................................23

*Nyhuis v. Reno*,
    204 F.3d 65 (3d Cir. 2000) ................................................................19

*O'Toole v. United States*,
    295 F.3d 1029 (9th Cir. 2002) ...........................................................21

*Rhodes v. Chapman*,
    452 U.S. 337 (1981) .........................................................................18

*Rich v. U.S.*,
    811 F.3d 140 (2015) .......................................................... 23, 25, 26

*Sledge v. U.S.*,
    723 F. Supp. 2d 87 (D.D.C. 2010).....................................................25

*United States v. Gaubert*,
    499 U.S. 315 (1991) .................................................................. 11, 21

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ................................................................. *passim*

**Statutes & Other Authorities:**

U.S. Const. amend. VIII............................................................... *passim*

18 U.S.C. § 4042 ..........................................................................11

18 U.S.C. § 4042(a)(2)................................................................2, 8

18 U.S.C. § 4042(a)(3)................................................................2, 8

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. § 1346(b)(1)...................................................................11

28 U.S.C. § 2671 .............................................................................1

28 U.S.C. § 2674 ................................................................................2

28 U.S.C. § 2680(a) ....................................................................... 2, 11

28 C.F.R. § 542.16 ............................................................................20

Fed. R. App. P. 4(a)(1)(B) ..................................................................1

Fed. R. Civ. P. 8(d) ..........................................................................19

## JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of West Virginia had jurisdiction as the action was filed below under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971), against individual employees of USP Hazelton ("Hazelton") and also under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671 et seq., against the United States of America ("USA").

This Court has jurisdiction over the appeal from that court's final order under 28 U.S.C §1291.

The district court entered judgment on both the *Bivens* claims and the FTCA claims, dismissing the complaint *in toto* with prejudice on January 12, 2022. **JA 285-286**. William Bulger, Administrator of the Estate of his uncle, James J. Bulger, timely filed his notice of appeal pursuant to Federal Rules of Appellate Procedure Rule 4(a)(1)(B) on January 31, 2022.

## STATEMENT OF THE ISSUES

1.    Pursuant to the 8th Amendment of the United States Constitution and *Bivens* claims against the individual federal prison officials ("individual defendants") can be brought against those who have failed in their duty to provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter, and medical care; or take reasonable measures to guarantee the safety of

the inmates, including protecting prisoners from violence inflicted upon them by other prisoners. *Farmer v. Brennan*, 511 U.S. 825 (1994).

2.      The BOP must "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection…of all persons charged with or convicted of offenses against the United States." 18 U.S.C. §4042(a)(2)-(3).

3.      Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. §2674.

4.      The liability of the United States is limited by an "discretionary function exception" ("DFE") under 28 U.S.C. §2680(a), which states that:

> [a]ny claimed based upon an act or omission of an employee of the government exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance, or the failure to exercise or perform a discretionary function or duty on the part of the federal agency, or an employee of the government, whether or not the discretion involved be abused.

5.      The first issue before the court is whether the Appellant's 8th Amendment failure to protect claims present a "new *Bivens* context" under the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), thus barring those claims, and also whether the court below was justified in granting judgment for the individual defendants based upon the pleadings before any discovery was conducted.

2

6.     The issue before the court regarding the Appellant's FTCA claims against the United States are whether the DFE of the FTCA applies in the instant case, thus barring the plaintiff's claims, and also whether the court below was justified in granting judgment for the defendant based upon the pleadings before any discovery was conducted.

## STATEMENT OF THE CASE

William Bulger is the nephew of James J. Bulger, Jr., and is the Administrator of the Estate of James J. Bulger (hereinafter "James Bulger"). James Bulger was an 89 year old man with chronic heart and other ailments, who required a wheelchair to move around. He was an inmate within the BOP who had been initially assigned to USP Tucson. He was subsequently transferred to USP Coleman II, from which he was lastly sent to Hazelton, where he was killed.

James Bulger arrived at Hazelton on October 29, 2018, at approximately 6:49 p.m. He had a "social interview" at 7:25 p.m., his PSR and Inmate Central File was reviewed, and he was then referred for a "psychological exam" at 8:21 p.m. See Declaration of Mr. Brawley, with attachment, at **JA 107-110**. This is a mandatory process, as noted by Mr. Brawley, who states that "within 24 hours of an inmate's arrival, medical staff shall screen the inmate in compliance with BOP medical procedures to determine if there are medical reasons for housing the inmate away from general population." **JA 108**.

3

The BOP announced in a press release that James Bulger was found dead in his cell at 8:20 a.m. on October 30, 2018, which was reported by the media. See https://www.bostonglobe.com/metro/2018/10/30/read-statement-james-whitey-bulger-from-federal-bureau-prisons/E2CC1n3XUJCEe9ea1mgaeI/story.html; see also **JA 27 ¶11**. His precise time of death is unknown.

It is unknown if James Bulger ever had the referred psychological exam. It is unknown whether the medical staff performed the mandatory screening before Mr. Bulger was placed in general population at the facility. It is unknown what was specifically discussed during the social interview, as Mr. Brawley apparently has based his declaration on a review of the form attached to his declaration. Even the name of the interviewer is unknown, as his/her signature is illegible. It is public knowledge that "[s]taff will systematically and objectively review an inmate's classification making the environment in which they are housed safer for both inmates and staff while protecting the public from undue risk." https://www.bop.gov/policy/progstat/5100_008.pdf. Further BOP policies to be followed require the initial classification, designation, and review of the appropriate placement of inmates. But it is unknown what internal protocols, written or unwritten, were in place during James Bulger's intake, or whether 5100.08 was even followed by prison officials. It is unknown whether the guidance was initially followed and then for reasons unknown abandoned, or whether the

4

forms and checklists or other procedural mechanisms were "pencil-whipped" to make James Bulger eligible (on paper at least) to be transferred to Hazelton.

These questions, and many others about the treatment of James Bulger during his time in BOP facilities, will remain unanswered without discovery. Even the accuracy and/or veracity of the statements in the declarations or forms attached have not been able to be tested, as no discovery was conducted before the court below dismissed the case upon the pleadings.

What we do know is this: the treatment of James Bulger at this time was outrageous. It is irrefutable that Hazelton is one of the most violent institutions in the BOP. As discussed in detail throughout the briefing below, see **JA 204**, it is widely known to be a "gang-run yard," with numerous serious assaults and homicides occurring year after year. The level of violence at Hazelton is well-known to all of the defendants in this matter.

Current high level BOP officials have even decried the decision-making that ultimately resulted in James Bulger's medical treatment level being manipulated from a Care Level 4 to a Care Level 2 (rendering him eligible to go to Hazelton). For example, when speaking with the media about James Bulger's death, Joe Rojas, president of American Federation of Government Employees Local 506 at the Federal Correctional Complex in Coleman, Florida, who has no material interest in the outcome of this matter, stated, "It's like sending "somebody to death

row… [a] previous request made by officials at Coleman to transfer Bulger was denied in April … the request was coded to indicate Bulger required a higher level of medical care, or Care Level 4, for inmates who are severely impaired and may require daily nursing care." In October, however, a transfer request was submitted and coded at the lower level of Care Level 2 to indicate he no longer needed to be in a medical facility." Rojas continued, going so far as to say:

> I don't care who you are, you can't justify dropping him … to a 2. … He's always going to be (at least) a Care Level 3 because of his age and he's in a wheelchair with heart problems…The only way you drop him to a Care Level 2 is to get rid of him…Their intent was to get rid of him, probably because he was a crusty old man and a pain in the ass.
>
> ***
>
> We all know that you can't put somebody like (Bulger) – high profile – there ... **It's like throwing meat to a bunch of sharks.**

(emphasis added), **JA 214-215**, citing https://www.cnn.com/2018/11/08/us/james-whitey-bulger-prison-transfer/index.html, updated April 25, 2019.

Cameron Lindsay, a retired warden living in Morgantown, West Virginia, found James Bulger's death "a shocking failure on multiple levels " and stated "[t]here's absolutely no way Bulger should have been sent to Hazelton, and he sure as heck should never have been released to the compound at Hazelton… It's difficult to imagine how and why so many people dropped the ball on this thing." **JA 214**. See https://www.nbcnews.com/news/crime-courts/whitey-bulger-s-funeral-held-south-boston-n934021.

6

The reason for this outrage, it must be remembered, is that in addition to his precarious medical situation, James Bulger, throughout his time as a prisoner of the BOP, faced a substantial risk of serious harm due to his widespread notoriety for a variety of reasons, including his well-known criminal exploits, his evasion of capture for a number of years and especially for his work as an informant for the FBI against mafia figures in the Boston area. Numerous articles, books, and movies depicted James Bulger as the informant that "took down the Boston Mafia." And, during his well-publicized trial, in addition to details regarding his activities as an informant, he was also accused at trial by one mob witness, in a much publicized incident, of being a pedophile. **JA 36 ¶¶52-54**.

It is well known by law enforcement, prosecutors, and correctional officers that being labeled an informant (in prison parlance "snitch") or pedophile or "child molester" (in prison parlance "chomo") puts an inmate at a substantial risk of harm and that, under the 8th Amendment, reasonable measures must be taken to protect such a prisoner. **JA 36 ¶56**.

James Bulger was initially placed at USP Tucson and then USP Coleman II. Both are generally known as "soft yards" or "closed yards" where inmates who are vulnerable, or medically compromised, and in need of protection are placed. Inexplicably, he then was transferred to Hazelton where, within hours of his placement in general population, inmates believed to be from New England and

who are alleged to have Mafia ties or loyalties, killed him, utilizing methods that included the use of a "lock in a sock" bludgeoning weapon. **JA 42 ¶96**.

The Appellant believes, and has particularly alleged, that prison officials involved in the designation, placement, transfers, and supervision of James Bulger, including at his final destination, USP Hazelton, were very aware that he was a well-publicized and notorious snitch and/or child molester who was 89 years old and wheelchair-bound, with medical and mental difficulties when he arrived at Hazelton. He would be at a substantial risk of serious harm, with little means of protecting himself. Those individual defendants who are identified and those who have yet to be identified but are listed as John/Jane Does, individually subjected James Bulger to a high risk of certain death or serious bodily injury by their deliberate indifference to the substantial risk of harm stemming from their failure to protect him from harm and/or to intervene during the assault to prevent injury. That deliberate indifference caused him to endure a violent death at the hands of another inmate(s) within hours of his arrival at the Hazelton.  **JA 42 ¶96**.

The Appellant also believes and has alleged throughout his 18 U.S.C. § 4042(a)(2)-(3) and FTCA causes of action that officials involved in the designation, placement, transfers, and supervision of James Bulger, including at his final destination of USP Hazelton, had a duty to protect him from harm, and that they failed in that duty. Therefore the United States, who is responsible for their

conduct, is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of West Virginia. **JA 47 ¶124**.

William Bulger filed, on behalf of the decedent, his Form 95 by letter dated September 20, 2019, which was denied by the USA by letter on April 26, 2021. **JA 18-23**. He then filed his original complaint, which was amended without objection to include the actual names of some of the individual defendants. Some defendants still remain unknown at this time. See Second Amended Complaint filed September 1, 2021. **JA 24-51**.

Before answering the Complaint and prior to filing their respective Motions to Dismiss, the individual defendants and the USA jointly filed a Motion to Stay Discovery-Related Deadlines on September 10, 2021. **JA 52-60**. After briefing by all parties, the court denied the defendants' motion on October 7, 2021, ordering the parties to submit a Rule 26(f) report and completed Scheduling Order Checklist. On October 14, 2021, the court filed its Scheduling Order, setting the required deadlines, including a trial date of February 22, 2023. **JA 77-85**.

On October 22, 2021, the individual defendants filed their Motion to Dismiss regarding the 8th Amendment *Bivens* claims, and the USA separately filed its motion to dismiss the FTCA claims. **JA 89-105** and **JA 114-154**. On the same

9

day, all of the defendants jointly filed a "Renewed Motion to Stay Discovery."

**JA 155-162**. Appellant believes that, despite the defendants' protestations of the

"undue burden" of discovery, the real root cause of their relentless efforts to avoid

divulging the facts behind James Bulger's death was a concern that, as Mr. Rojas

and Mr. Lindsay believe, their actions would be found grossly negligent to the

point of being shocking, with discovery generally being supportive of Appellant's

allegations of deliberate indifference and negligence.

As no discovery has occurred, Appellant can only rely on the statements

made by BOP officials and the personal knowledge of his counsel to speculate at

the defendants' levels of negligence. The opportunity for Mr. Bulger to engage in

discovery, scheduled to occur by the lower court after its denial of the defendants'

Motion to Stay Discovery (**JA 72-75**), was rendered impossible by the court's

dismissal order. **JA 285-286**.

It is from that order of dismissal of all claims with prejudice and that denial

of the opportunity for discovery that Mr. Bulger has brought this appeal.

## **SUMMARY OF ARGUMENT**

The 8th Amendment *Bivens* claims against individual prison officials as

alleged in the complaint are not a "new context" and do not create a forbidden

expansion or forbidden extension of *Bivens* under *Ziglar v. Abbasi*, 137 S. Ct. 1843

(2017). Therefore, the court below erred when it granted the Individual

Defendants' Motion to Dismiss before discovery was conducted.

Pursuant to 18 U.S.C. § 4042, "…[t]he Bureau of Prisons …shall … provide

for the safekeeping, care, and subsistence [of federal prisoners]… [and] provide for

the protection … of all [federal prisoners]. . . ." And under the FTCA, the United

States is liable for "… personal injury or death caused by the negligent or wrongful

act or omission of any employee of the Government ... if a private person, would

be liable" in like circumstances. 28 U.S.C. § 1346(b)(1).

Therefore, the court below erred when it applied the DFE in this case

because, even if the actions of the United States involved the exercise of judgment,

"[s]uch actions do not reflect the kind of considered judgment grounded in social,

economic, and political policy' which the [discretionary function exception] is

intended to shield from 'judicial second guessing.'" See 28 USC § 2680(a);

*Coulthurst v. United States*, 214 F.3d 106, 111 (2nd Cir. 2000); see also *United

States v. Gaubert*, 499 U.S. 315, 322-23, and 325 N7 (1991).

In order to determine whether the DFE applies, a court must make a

fact-specific determination of what judgments or choices were made, if any, and if

some were made, what possible social, economic, and political policy was being

exercised that would justify the application of the DFE. No such analysis was

done, and the trial court erred when it entered judgment on the pleadings. At a

minimum, the judgment below should be vacated so that the case can proceed on the merits and the parties can seek discovery, with dispositive motions to be later addressed at the Rule 56 Summary Judgment stage.

## ARGUMENT

## I. THE STANDARD OF REVIEW

This Court reviews a judgment on the pleadings *de novo*. *Burbach Broadcasting Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002).

## II. DISCUSSION OF THE ISSUES

### A. Plaintiff's 8th Amendment *Bivens* claims remain viable after *Ziglar v. Abbasi*.

#### 1. The *Abbasi* test for *Bivens* expansion.

Mr. Bulger's 8th Amendment failure to protect claims do not present a "new *Bivens* context" under the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). *Abbasi* was brought by six non-citizens who were taken into federal custody in the wake of the September 11, 2001, terrorist attacks. *Id*. at 1852-53. The plaintiffs alleged that they were abused while in custody and asserted 5th Amendment Due Process claims under *Bivens* based on discrimination against them due to their race, religion, and/or national origin. *Id.* In determining whether a *Bivens* remedy existed in this context, the Supreme Court emphasized the factual circumstances from which the plaintiffs' claims arose. See *Id*. at 1858 ("It is appropriate now to turn first to the *Bivens* claims challenging the conditions of

12

confinement imposed on respondents pursuant to the formal policy adopted by the Executive Officials in the wake of the September 11th attacks."). The Court also considered that the goal of the plaintiffs' detention policy claims—to change the high level detention policies implemented in a post-9/11 world—was not in accordance with the purpose of a *Bivens* claim. See *Id*. at 1860 ("With respect to the claims against the Executive Officials, it must be noted that a *Bivens* action is 'not a proper vehicle for altering an entity's policy.'" (citation omitted)). The Court stated that expanding the *Bivens* remedy is now a "disfavored" judicial activity and outlined a test by which courts should assess whether such an expansion should occur. *Id*. at 1857.

The first step is to determine whether a case presents a "new *Bivens* context" by asking whether the case is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, 137 S. Ct. at 1859. "Meaningful differences" can include "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; [and] the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Id*. at 1860. If the court determines that a "new *Bivens* context" exists, it must then engage in an analysis of whether any "special

13

factors counsel hesitation" in permitting an extension of the *Bivens* remedy. *Id*. at

1857. The Supreme Court identified a non-exhaustive list of possible "special

factors," including the existence of an alternative remedial structure and

separation-of-powers principles. *Id*. at 1857-58.

> **2. There is no "new *Bivens* context" presented by Mr. Bulger's 8th Amendment failure to protect claims because there is no "meaningful difference" between this case and previous 8th Amendment *Bivens* cases decided by the Supreme Court.**

Mr. Bulger's 8th Amendment *Bivens* claims are based on a failure to protect

theory of liability and are brought under the 8th Amendment's Cruel and Unusual

Punishments Clause. These claims assert that the individual defendants are liable

for violating James Bulger's constitutional rights because they were deliberately

indifferent to the substantial risk of serious harm that he faced in being sent to

Hazelton. Hazelton, as previously noted, is an extremely dangerous environment

for any prisoner, but especially one of James Bulger's status. His medical

vulnerability and combined "snitch" and "chomo" status, which very likely caused

him to be assaulted, were well known to the Defendants, and yet he was

inexplicably placed into the general population of the facility.

In *Farmer v. Brennan*, the Supreme Court addressed *Bivens* "failure to

protect" claims for prisoner-on-prisoner violence, which mirror the claims brought

here. In *Farmer*, a federal prisoner brought 8th Amendment failure to protect

claims under *Bivens* based on the risk of attack by other prisoners, which she faced

for being transsexual. *Farmer v. Brennan*, 511 U.S. 825, 829 (1994). The Court discussed and then applied the "deliberate indifference" standard from its prior 8th Amendment cases to the plaintiff's *Bivens* claims. *Id*. at 834-840. For purposes of *Abbasi*'s "new *Bivens* context" analysis in this case, *Farmer* ends the inquiry at the first step—there is simply no meaningful difference between this case and *Farmer*. Both cases involve 8th Amendment failure to protect claims based on prisoner-on-prisoner violence, and *Farmer* is indisputably a "previous *Bivens* case decided by the Supreme Court." See *Abbasi*, 137 S. Ct. at 1859.

To the extent a question may exist regarding whether a *Bivens* remedy is viable in 8th Amendment claims such as those asserted here, it should be noted that since *Abbasi*, the Fourth Circuit has not rendered an opinion on the issue and any appellate court discussion in other circuits is scant as well. However, the Third Circuit, in a well-reasoned opinion, has found that prisoner-on-prisoner violence and the failure to protect are **not** new contexts for *Bivens* claims. *Bistrian v. Levi*, 912 F.3d 79, 88 (3d Cir. 2018). In that case, the appellate court dealt with three *Bivens* claims and held that the inmate had a cognizable cause of action for his failure to protect claim, did not have a cognizable claim for his punitive detention claim, and did not have a cognizable claim for his retaliation claim. The court in the instant case mentioned *Bistrian* in passing, see **JA 267**, but quotes from the

wrong section of the opinion (i.e., the decision-making in putting an inmate in punitive detention) and ignores the "failure to protect" ruling in its entirety.

The Third Circuit's analysis in *Bistrian* is worthy of study. Bistrian was a federal prisoner at the FDC Philadelphia who asserted *Bivens* claims based on BOP staff's failure to protect him from violent assaults by other prisoners. See *Bistrian*, 912 F.3d at 84. In conducting the analysis required by *Abbasi*, the Third Circuit relied on *Farmer* and held that there was no "new *Bivens* context" presented by the plaintiff's failure to protect claims for prisoner-on-prisoner violence. See *Id*. at 91. The *Bistrian* court so held even though the failure to protect claims in *Bistrian* stemmed from the 5th Amendment's Due Process Clause instead of from the 8th Amendment. See *Id*. ("[a]lthough Bistrian's claim derives from a different amendment, it is not 'different in a meaningful way' from the claim at issue in Farmer. . . the failure-to-protect claim here thus does not call for any extension of *Bivens*." (citing *Abbasi*, 137 S. Ct. at 1859)). If the 5th Amendment due process claims in *Bistrian* do not present a "new *Bivens* context" because of *Farmer*, then the claims asserted here—brought under the 8th Amendment, as in *Farmer*— present a solid case that should be allowed to proceed.

The court below ignores the undeniable and unrefuted fact that James Bulger had an easily identifiable and unique vulnerability ("a target on his back," as the court put it, **JA 274**) much like inmate Farmer, and was clearly at a substantial risk

16

of harm. Specifically identifying the actual harm that would befall James Bulger is not necessary. A plaintiff need only allege facts that show that prison officials were aware of the risk of such harm and yet did nothing to abate the risk. See *Farmer*, 511 U.S. at 847. Knowledge of the substantial risk of harm can be proven "in the usual ways, including inference from circumstantial evidence." *Id.* at 842. The conduct of the defendants in initially attempting to care for James Bulger's medical needs and protect him by placing him in institutions with "soft yards" and with higher medical care levels indicate their knowledge of how an inmate with James Bulger's unique vulnerabilities should have been treated. Indeed, the older and feebler he became, the more his vulnerabilities manifested.

Finally, it must be remembered that the primary focus of the "new *Bivens* context" discussion in *Abbasi* was on the social and political atmosphere following the September 11, 2001, terrorist attacks. *Abbasi*'s lengthy review of the circumstances giving rise to the detainees' claims, including that the detainees were not citizens, that the claims arose in the post-9/11 world where national security interests were paramount, and where "the stakes on both sides of the argument are far higher than in past cases the Court has considered," see *Abbasi*, 137 S. Ct. at 1861-1863, makes it clear that these claims were unlike any claims brought under *Bivens* in the past. Even with that determination, the *Abbasi* court noted that "a case can present a new context for *Bivens* purposes if it implicates a

different constitutional right [or] if judicial precedents provide a less meaningful

guide for such conduct . . ." *Id*. at 1864. This is certainly not the case here, where

decades of federal jurisprudence have provided a framework for evaluating a

prisoner's 8th Amendment right to be free from cruel and unusual punishment in a

variety of contexts. See, e.g., *Farmer*, *supra* (prisoner assault); *Hudson v.

McMillian*, 503 U.S. 1 (1992) (staff assault on prisoners); *Estelle v. Gamble*, 429

U.S. 97 (1976) (denial of medical care); *Rhodes v. Chapman*, 452 U.S. 337 (1981)

(serious deprivations of basic human needs).

The court below, in dismissing the claim, cited no appellate authority on the

issue of whether Bulger's 8th Amendment claims for failure to protect presented a

new context and ignored the specificity of Appellant's asserted causes of action.

**JA 251-286**.

> **3. Even if the Court were to find that Mr. Bulger's 8th Amendment Claims present a "new *Bivens* context," there are no alternative, existing remedies and no "special factors" that counsel hesitation in creating a *Bivens* remedy here.**

The Supreme Court has stated that it is "crystal clear that Congress intended

the FTCA and *Bivens* to serve as parallel and complementary sources of liability."

See *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (quoting *Carlson v.

Green*, 446 U.S. 14, 19-20 (1980)). *Carlson* observed that the *Bivens* remedy "is a

more effective deterrent than the FTCA because it is recoverable against

individuals." *Carlson*, 446 U.S. at 21. The Supreme Court further stated that the

"FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated [prisoners] exclusively to the FTCA remedy." *Id*. at 23. The FTCA does not extend or apply to a civil action brought for a violation of the Constitution of the United States. That Mr. Bulger has brought an FTCA claim in addition to his *Bivens* claims is of no matter, as the Federal Rules of Civil Procedure provide for pleading in the alternative. See Fed. R. Civ. P. 8(d).

The BOP's administrative remedy program ("ARP") is insufficient for Mr. Bulger. *Bistrian* noted that this system does not prevent the availability of a *Bivens* remedy because, as in *Bivens*, it was a case where "it is damages or nothing," observing that money damages are not available in the BOP's grievance system. *Bistrian*, 912 F.3d at 92 (citing *Nyhuis v. Reno*, 204 F.3d 65, 70 (3d Cir. 2000)). In the instant case, the court below recognized that the ARP does not "include a money damages remedy" nor "redress constitutional violations." **JA 271**. However, it went on to speculate that "Bulger had the option of filing an administrative grievance or seeking an injunction while his transfer to USP Hazelton was pending." **JA 271**. This goes against counsel's experience, which is that, for security reasons, prisoners are not informed (nor are their counsel) of when and where they are to be transported. Given the short window of time that James Bulger may have learned of his transfer location, even including when he

19

was physically at Hazelton, it is obvious that he would have had no real opportunity to initiate any sort of formal grievance process.

It is believed that Mr. Bulger was beaten to death soon after his arrival at his cell. Obviously, he could not avail himself of the ARP regarding his attack. Even if he had survived the assault, he had no notice of the identities of his attackers, no notice of the identities of the individual defendants, and he had no notice of how the USA had failed in their duty to make the appropriate choices to protect him from assault. Also, although as the court below noted, see **JA 270**, the ARP process does permit an inmate to obtain the assistance of an attorney in preparing an administrative remedy request, it failed to appreciate that the grievance process does not permit someone other than an inmate to file one on another inmate's behalf. See 28 C.F.R. § 542.16; P.S. 1330.018, Section 10 "Assistance." The so-called "alternative remedial structure" of the FTCA and the ARP are just not applicable in the case at bar. As a result, no evidence has been shown that would indicate that the *Abbasi* special factors should come into play.

**B. The Discretionary Function Exception Cannot Shield Every Negligent Act of The Federal Government**

By enacting the FTCA, Congress intended to grant relief for citizens from the complete bar of sovereign immunity. See, e.g., *Kielwien v. United States*, 540 F.2d 676, 681 (4th Cir.1976) ("The [FTCA] is remedial and should be liberally

construed to grant the relief contemplated by Congress ....”), cited by *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002).

In the two-step test of *United States v. Gaubert*, 499 U.S. 315 (1991), a court must first determine if the conduct is subject to a mandatory statute, regulation, or policy that requires a specific course of action. *Id*. at 322.  If there is such a mandatory directive and the government failed to follow it, then the DFE does not apply. However, if no such mandatory directive can be found and the conduct is considered discretionary then a second step must be employed by the court. *Id*.

At the second step, the court must determine whether the particular government conduct can be said to constitute an exercise of policy judgment or "based on considerations of public policy." *Id*. at 323. It is at this step that courts must analyze "the nature of the actions taken and . . . whether they are susceptible to policy analysis." *Id*. at 325. (See also the discussion and points of authority in the Plaintiff's Response to the USA Motion to Dismiss.  **JA 219-226**.)

This analysis was not done by the court below. Instead, the court believed that the "prison [officials] should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (internal quotes omitted). **JA 280**, citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

21

The court also felt that the BOP's actions "must be presumed" to be grounded in public policy. **JA 283**.

The BOP does not deserve such deference or the benefit of such a presumption in this case. The obvious dangers presented to James Bulger cannot be swept under a broad rug of discretion and presumption that everything has been conducted according to policy, "nothing to see here."

Where there is acute and immediate danger, courts have held that no policy could justify failing to warn or intervene. See, e.g., *Andrulonis v. United States*, 952 F.2d 652 (2d Cir. 1991) *cert. granted*, *judgment vacated sub nom.* in *New York State Dep't of Health v. Andrulonis*, 502 U.S. 801, 112 S. Ct. 39, 116 L. Ed. 2d 18 (1991) and on reconsideration, 952 F.2d 652, 655 (2d Cir. 1991). Upon remand, the court reiterated:

> In our view, the government's argument cuts too broad a swath. Its attempt to sweep all of Dr. Baer's acts and omissions under the rug of broad CDC policy would effectively insulate virtually all actions by a government agent from liability, excepting only those where the agent had acted contrary to a clear regulation.
>
> ***
>
> Looking at the "nature of the conduct" in this situation, we do not see how Dr. Baer's negligent omission could possibly have been grounded in CDC's policy scheme. Nothing indicates that CDC policy required, or even encouraged, Dr. Baer to ignore unsafe laboratory conditions and thereby unnecessarily place the lives of laboratory workers at risk in order to further a scientific cause or any other objective of the government. The general policy of wanting to eradicate rabies and granting officials some discretion to achieve those ends is far too broad

22

and indefinite to insulate Dr. Baer's negligent conduct in the circumstances of this case.

*Id.*

If the individual defendants failed to do their jobs, the United States should not be shielded by a theory that such failure was motivated by some policy decision. As stated in *Coulthurst*, 214 F.3d at 111, "([a]n inspector's decision (motivated simply by laziness) to take a smoke break rather than inspect the machines, or an absent-minded or lazy failure to notify the appropriate authorities upon noticing the damaged cable ... do not involve 'considerations of public policy.'" Cited with approval by *Rich v. U.S.*, 811 F.3d 140, 147 (2015) ("…the discretionary function exception would not apply to a prison official's inspection of faulty weight equipment that caused plaintiff's injuries if that inspection was performed in a 'carelessly inattentive' manner.").

In the instant case, it should be clear that, regardless of whether any clear mandatory policies existed, the acute and immediate danger James Bulger faced in Hazelton was well known. Unlike the rank-and-file inmates observed by the court below who faced less obvious dangers, such as assault by a screwdriver, **JA 283**, discussing *Evans v. United States*, No. 3:15-CV-64 (GROH), 2016 U.S. Dist. LEXIS 119152 (N.D.W. Va. Sep. 2, 2016) or the prison failing to notice that an inmate's cellmate was the brother of his victim, **JA 282**, discussing *Little v. United States*, Civil Action No. 5:11cv41, 2014 U.S. Dist. LEXIS 114264 (N.D.W. Va.

23

Aug. 1, 2014), James Bulger was not an obscure background figure. He was a

well-known pariah, universally hated by law enforcement and criminals alike. In a

gang-run yard like Hazelton, he would never be accepted into the protective sphere

of any gang, due to his history as an informant and allegations of being a "chomo."

The opposite in fact is the truth: he was a target for assault, as all inmates have an

obligation to assault people of his status—a fact that is known by the BOP. The

fact that his medical status was apparently manipulated to allow him, an elderly,

wheelchair-bound man, to be put in Hazelton puts into question what conceivable

public policy was being followed or what legitimate penological objective was

being sought. This conduct is not the type of conduct that the DFE was intended to

shield.

### C. The Court Below Should Have Permitted Discovery Before Dismissing The Claim

For reasons unknown, the court below, after denying the defendants' Motion

to Stay Discovery, changed course and decide to quickly to dismiss Mr. Bulger's

*Bivens* and FTCA claims, as discussed above. As argued below at **JA 166**, the

information regarding how this obvious failure to protect Mr. Bulger occurred is in

the defendants' possession and control. Without discovery, Appellants have no

way to know how the individual defendants failed in their respective duties. Also,

Mr. Bulger "[has] no way to know what mandatory policies may bind" the BOP,

see *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001), and so any

24

"failure to explicitly allege in their complaint that BOP employees violated any mandatory directive is therefore of no moment." *Sledge v. U.S.*, 723 F. Supp. 2d 87, 95 (D.D.C. 2010).

As alleged in the Second Amended Complaint, **JA 38-44**, and in arguments below, **JA 203** and **JA 219-220**, there were a number of steps in the chain of events that caused James Bulger to be moved ultimately to Hazelton. These facts involved both security and medical concerns relating to his ongoing treatment and final placement at Hazelton. The specific facts, findings, security reports, medical reports and the like are all unknown, as are the specific internal policies, procedures, or protocols. The specifics of the actions or failure to act and the specific contents of the applicable written or unwritten procedures and protocols are unknown. The court below and this Court are left with only a few general BOP policies that are available on the web and what information the media has been able to gather and report. These unknown facts and policies could very well directly impact the FTCA claims and possibly the *Bivens* claims alleged in this matter.

As to Appellant's FTCA claims, this Court in *Rich*, *supra* at 147-148, found:

> Discovery provides a procedural safeguard when a jurisdictional inquiry would require the consideration of merits-based evidence. This safeguard does not disappear simply because the plaintiff is a prisoner. Of course, courts frequently apply the discretionary function exception to prison officials' efforts to ensure the safety of prisoners under difficult circumstances, and that may be the ultimate outcome here as

25

well. Nevertheless, we conclude that Rich is entitled to the safeguard of discovery before his complaint is dismissed. (citations omitted).

This court went on to recognize that jurisdictional facts can be intertwined with the allegations of the complaint, noting that they related to the issue of how pat down procedures alleged to have been done failed to uncover a nine inch shiv that had been carried into the SHU. *Rich*, 811 F.3d at 147-148. This court ordered the dismissal to be vacated and remanded for discovery on that very issue.

The same outcome should occur here so that the Defendants' "shocking failure on multiple levels," which caused the death of James Bulger, can be explored by the trial court. The facts discovered would facilitate a proper *Gaubert* two-step analysis regarding the discretionary function exception. Although the Appellant maintains that *Abbasi* does not operate to bar his *Bivens* claims at all, the facts surrounding the medical determinations of James Bulger's placement may even more closely align his case with *Carlson*. Discovery would uncover necessary facts to assist the court in a more robust *Abbasi* analysis.

## **CONCLUSION**

Therefore, Mr. Bulger respectfully requests that this Court reverse the trial court's dismissal order and hold that his 8th Amendment *Bivens* claims should be permitted to proceed because they are not in violation of *Ziglar v. Abbasi* or otherwise barred. Further, he requests that this Court find that the DFE of the FTCA is not an applicable defense to his claim. If this Court does not so rule, in

the alternative Mr. Bulger prays that the Court vacate the judgment below, and

remand to allow discovery to proceed so that more facts about this case can be

developed to allow the trial court to properly rule on the merits of his 8th

Amendment and FTCA claims.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument.

Respectfully submitted,
*/s/Jay T. McCamic*
Jay T. McCamic
WV Bar #2386
Law Firm, PLLC
80 12th Street
Suite 305
Wheeling, WV 26003
ph: (304) 238-9460
fax: (304) 830-5324
jay@mccamic.com
Counsel for William M. Bulger, Jr.,
Administrator of the Estate of James J. Bulger

27

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. _22-1106_          **Caption:** _Bulger v. Hurwitz, et al._

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.    Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

- [✓] this brief or other document contains _____6,577_____ [*state number of*] words

- [ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

- [✓] this brief or other document has been prepared in a proportionally spaced typeface using _MS Word_ [*identify word processing program*] in _Times New Roman, 14 point_ [*identify font size and type style*]; **or**

- [ ] this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) _Jay T. McCamic_

Party Name _appellant_

Dated: _3/15/2022_