# 22-1106

# United States Court of Appeals
## *for the*
# Fourth Circuit

WILLIAM M. BULGER, Administrator of the
Estate of James Bulger,

*Plaintiff-Appellant,*

– v. –

HUGH HURWITZ, formerly John Doe 1 - ALL OF WHOM ARE EMPLOYEES
OF THE FEDERAL BUREAU OF PRISONS; J. A. KELLER, formerly John Doe
3 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF
PRISONS; ANGELA DUNBAR, formerly Jane Doe 4 - ALL OF WHOM ARE
EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; R. C.
CHEATHAM, formerly John Doe 5 - ALL OF WHOM ARE EMPLOYEES OF
THE FEDERAL BUREAU OF PRISONS; CHARLES LOCKETT, formerly John
Doe 6 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF
PRISONS; JOSEPH COAKLEY, formerly John Doe 7 and 8 - ALL OF WHOM
ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS;

―――――――――――――――

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT MARTINSBURG

# REPLY BRIEF OF APPELLANT

ANTHONY I. WERNER
JOHN & WERNER LAW OFFICES, PLLC
80 12th Street, Suite 200
Wheeling, West Virginia 26003
(304) 233-4380
awerner@johnwernerlaw.com

JAY T. MCCAMIC
MCCAMIC LAW FIRM, PLLC
80 12th Street, Suite 305
Wheeling, West Virginia 26003
(304) 238-9460
jay@mccamic.com

*Counsel for Plaintiff-Appellant*

*(For Continuation of Appearances See Inside Cover)*



AMY RUIZ, formerly Jane Doe 9 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JEFFREY SMITH, formerly John Doe 10 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; ALICE PISANESCHI, formerly Jane Doe 11 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JEREMY SHIRK, formerly John Doe 12 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; ANTHONY MORI, formerly John Doe 13 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; BRANDON BOLEDOVIC, formerly John Doe 14 - ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JOHN/JANE DOE 2, ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; JOHN/JANE DOES 15-30, ALL OF WHOM ARE EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS; UNITED STATES OF AMERICA,

*Defendants-Appellees.*

L. DANTE' DITRAPANO
SEAN B. SHRIVER
CALWELL LUCE DITRAPANO PLLC
500 Randolph Street
Charleston, West Virginia 25302
(304) 400-6558
dditrapano@cldlaw.com
sshriver@cldlaw.com

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... ii

SUMMARY OF ARGUMENT .............................................................1

ARGUMENT ......................................................................................1

Mr. Bulger's 8th Amendment *Bivens* claims are viable..................1

The Estate's FTCA Claims Should not be Barred by the
Discretionary Function Exception. ...................................................5

Without Discovery a Court Cannot Correctly Analyze the
Numerous Fact Based Threshold Factors Required to Make
Determinations Regarding the Applicability of *Bivens* and/or the
FTCA. ..............................................................................................8

Relying on the BOP's Administrative Remedy Program as a
"special factor" in this matter is not appropriate ...........................12

CONCLUSION ................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Andrulonis v. United States*,
    952 F.2d 652 (2d Cir. 1991) ...........................................................7

*Berkovitz v. United States*,
    486 U.S. 531, 108 S. Ct. 1954 (1988) ........................... 5, 6, 7, 11

*Bivens v. Six Unknown Fed. Narcotics Agents,*
    403 U.S. 388 (1971).......................................................... *passim*

*Botway v. Carlson*,
    474 F. Supp. 836 (E.D. Va. 1979) .................................................3

*Callahan v. Fed. Bureau of Prisons*,
    965 F.3d 520 (6th Cir. 2020) .......................................................13

*Carlson v. Green*,
    446 U.S. 14 (1980).....................................................................2, 3

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61, 122 S. Ct. 515, 151 L. Ed. 2d 456 (2001) .................3

*Coulthurst v. United States*,
    214 F.3d 106 (2d Cir. 2000) ..........................................................7

*Davis v. Passman*,
    442 U.S. 228 (1979).......................................................................2

*Farmer v. Brennan*,
    511 U.S. 825 (1994)....................................................................2, 3

*LaFaut v. Smith*,
    834 F.2d 389 (4th Cir. 1987) .........................................................3

*Loe v. Armistead*,
    582 F.2d 1291 (4th Cir. 1978) .......................................................3

*New York State Dep't of Health v. Andrulonis*,
    502 U.S. 801, 112 S. Ct. 39, 116 L. Ed. 2d 18 (1991) .................7

*Rich v. United States*,
    811 F.3d 140 (4th Cir. 2015) ................................................ 6, 12

*Rivera-Quinones v. Rivera-Gonzalez*,
  397 F. Supp. 2d 334 (D. Puerto Rico. 2005) ...................................................16

*Ross v. Blake*,
  136 S. Ct. 1850 (2016)....................................................................................14

*Simmons ex rel. Est. of Simmons v. Johnson*,
  No. 7:05 CV 00053, 2005 WL 2671537 (W.D. Va. Oct. 20, 2005) ............16

*United States v. Gaubert*,
  499 U.S. 315, 111 S. Ct. 1267 (1991) ........................................... 5, 6, 7, 11

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017)............................................................................. *passim*


**Statutes & Other Authorities:**

28 U.S.C. § 2680(a) ................................................................................................1

42 U.S.C. § 1997......................................................................................................5

28 C.F.R. § 542.10 ................................................................................................15

28 C.F.R. § 542.13 ................................................................................................15

28 C.F.R. § 542.18 ................................................................................................13

Krawiec, K.D., *Cosmetic Compliance and the Failure of Negotiated
  Governance*, 81 Wash. U. L.Q. 487 (Summer 2003)....................................17

## SUMMARY OF ARGUMENT

In this reply brief, within the space limits required by the rules, William M. Bulger, Administrator of the Estate of James Bulger, Jr. (hereinafter the "Bulger Estate") addresses the factual and legal issues raised in the Defendants-Appellees' (hereinafter the "United States") Brief and herein argues that the Bulger Estate's 8th Amendment *Bivens* claims, under the *Ziglar v. Abbasi* analysis, as well as his FTCA claims, under the "discretionary function exception," should *not be* dismissed.

Additionally, the Bulger Estate argues that this Court should remand the matter to permit discovery on the many factual questions this matter has, which would aid the lower court in conducting the rigorous two step analysis required by *Ziglar v. Abbasi* to determine whether this matter's *Bivens* claims creates a new context or category of defendants. Discovery would permit the factual development necessary to answer the ultimate question of whether the United States is liable "in the same manner and to the same extent as a private individual under like circumstances…" as 28 U.S.C. 2680(a) mandates.

## ARGUMENT

### Mr. Bulger's 8th Amendment *Bivens* claims are viable.

Despite the narrowing of the availability of *Bivens* claims under *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Bulger Estate's case passes muster, fitting

within both the permitted context and category of defendants. In *Ziglar*, the Supreme Court recognized three contexts wherein an "implied right of action" exists for damages against federal officials alleged to have violated a citizen's constitutional rights. The first is under the 4th Amendment and was established in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). In *Bivens*, the Supreme Court found that Federal Bureau of Investigation agents conducted an unreasonable search and seizure when they handcuffed a man in his own home without a warrant. The second was established in *Davis v. Passman*, 442 U.S. 228 (1979), a gender discrimination case that involved the 5th Amendment's Due Process Clause after a congressman fired his female secretary. The third context was recognized in *Carlson v. Green*, 446 U.S. 14 (1980), under the 8th Amendment's prohibition on cruel and unusual punishment, when prison officials were deliberately indifferent to an inmate's medical needs, leading to his death.

Later, in *Farmer v. Brennan*, 511 U.S. 825, 829 (1994), the court recognized a *Bivens* claim under the 8th Amendment for prisoner-on-prisoner violence and prison officials failing to protect, ruling without comment. The United States places much significance on the fact that the court in *Farmer* in 1994 made no explicit comment about applying *Bivens* in the 8th Amendment context. Brief for Defendants-Appellees, Dkt. 18 at page 27. In fact, it would be odd if the court did explicitly talk about *Bivens*, since courts had routinely been applying *Bivens* in the

2

8th Amendment context for years. *Botway v. Carlson*, 474 F. Supp. 836, 839 (E.D. Va. 1979); *LaFaut v. Smith*, 834 F.2d 389, 390 (4th Cir. 1987); *Loe v. Armistead*, 582 F.2d 1291, 1294 (4th Cir. 1978) (stating that there is "no principled basis for limiting *Bivens* to the fourth amendment. *Bivens* teaches that . . . federal courts may grant traditional damage remedies . . . to persons whose constitutional rights have been violated.").

The United States also makes much of the fact that the Supreme Court in *Ziglar*, citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68, 122 S. Ct. 515, 520, 151 L. Ed. 2d 456 (2001), commented in *dicta* that it had refused to extend *Bivens* to a "new context" in "30 years." Brief for Defendants-Appellees, Dkt. 18 at page 27. The actual quote from *Malesko*, a 2001 case, is "[s]ince *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68, 122 S. Ct. 515, 520, 151 L. Ed. 2d 456 (2001). An equally plausible interpretation of this comment is that *Farmer* did not present a new context or category of defendant, and thus did not require specific discussion.

The facts surrounding the mistreatment of Mr. Bulger should not be found to present a new context or category of defendant when examining his case alongside *Carlson*, especially since *Farmer* has never been overruled and Mr. Bulger's 8th Amendment violation at the hands of the defendants was inextricably

intertwined with his medical treatment, transfer to a higher security facility, and placement in general population.

The Bulger Estate denies that his case presents a "new context." But even if this court were to find that the case could conceivably be classified as presenting a "new context," a critical issue necessitates reversing the lower court's dismissal: the "special factors" portion of the *Ziglar* analysis was never performed. The trial court, in a freewheeling, conclusory fashion, mentioned various special factors but did not perform the necessary factual analysis regarding what happened in Mr. Bulger's case to determine if any special factors applied. JA 267. A "special factors" analysis, consistent with the requirements of *Ziglar*, cannot be performed without discovery.

Next, the court speculated that a "burden on the government" was a special factor militating against further discovery in the case. The court simply posited that a burden existed, without having been presented any evidence that the defendants, in this era of the digital storage of data and the vast resources of the Department of Justice, would be burdened by Mr. Bulger's 8th Amendment claims generally let alone by discovery more specifically. Nor is it clear why it would be specifically burdensome to examine the details of events that occurred within only two institutions over a relatively small time period spanning from Mr. Bulger's arrival at USP Coleman II in September of 2014 to October 30th, 2018, the day that he

was transferred to USP Hazelton, placed in general population, and ultimately died within 24 hours as the result of foreseeable prisoner-on-prisoner violence.

Additionally, the court below focused primarily on the Prison Litigation Reform Act, 42 U.S.C. §1997 ("PLRA"), and the BOP's Administrative Remedy Program ("ARP") as required by the PLRA, which the United States argues should be dispositive. Brief for Defendants-Appellees, Dkt. 18 at page 33. As discussed below, such an approach is inappropriate when examining the facts known in the Bulger Estate's case.

**The Estate's FTCA Claims Should not be Barred by the Discretionary Function Exception.**

The United States's viewpoint regarding the discretionary function exception is overly expansive, simplistic, and is an improper application of the law. In order to determine if the discretionary function exception applies, federal courts must use the two-part approach laid out first by the Supreme Court in *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954 (1988), and later affirmed by the Court in *United States v. Gaubert*, 499 U.S. 315, 111 S. Ct. 1267 (1991). First, the act must be discretionary in that it involves "an element of judgment or choice" rather than being specifically prescribed by a federal statute, regulation, or policy that leaves the employee "no rightful option but to adhere to a mandatory directive." *Berkovitz* at 536. Second, if the employee exercises judgment or choice,

the challenged action or decision must be based on considerations of public policy, *Id.* at 537, that is to say, "susceptible to policy analysis." *Gaubert* at 325.

When discussing the first element, the United States argues, as they always do, that there is no statute, regulation, or policy that specifically prescribes a course of action to follow. Thus, their argument goes, if there is no specific directive, then choice or discretion is involved, and therefore the government is immune from liability because the work that a particular agency does must always be presumed to be grounded in "social, economic and political policy". See Brief for Defendants-Appellees, Dkt. 18 at 10-16; see also *Rich v. United States*, 811 F.3d 140, 147 n.7 (4th Cir. 2015) (noting that because all actions involve some discretion "under the government's argument . . . the discretionary function exception would always apply."). But they gloss over the fact that an analysis of whether the conduct, even if grounded in the exercise of policy judgement, must "involve the *permissible* exercise of policy judgement." *Berkovitz* at 537.

It is that element of permissibility that informs the entire analysis. Consider the statements made by BOP Officer Rojas and ex-Warden Lindsay, discussed *supra*, regarding the matter. As employees of the BOP, they believe that what the defendants did, or failed to do, was impermissible. Discovery in this matter would enable the court to determine whether the defendants' actions were policy judgments.

The question of permissibility is a critical element, as the issues implicated by a discretionary function exception analysis can vary from relatively academic, such as the government's monetary policy, *Gaubert*, to potentially deadly, such as the safety and purity of childhood vaccines, *Berkovitz*, or the handling of highly toxic material in a government lab. *Andrulonis v. United States*, 952 F.2d 652 (2d Cir. 1991) *cert. granted*, *judgment vacated sub nom.* in *New York State Dep't of Health v. Andrulonis*, 502 U.S. 801, 112 S. Ct. 39, 116 L. Ed. 2d 18 (1991) and on reconsideration, 952 F.2d 652, 655 (2d Cir. 1991).

The issue of permissibility can completely change a case's outcome, as was the case in the 2nd Circuit in *Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000), discussed in the briefing below at JA 223, courts have found individuals liable for actions that have been found discretionary. In *Coulthurst*, the appellate court found that acts of negligence on the part of correctional officials were not shielded by the discretionary function exception because, even though such acts were discretionary, they were unrelated to any permissible policy objective. *Id*. at 111. Therefore, because the defendants's actions were not grounded in any policy, the court reversed the dismissal and ordered discovery to occur. *Id*.

**Without Discovery a Court Cannot Correctly Analyze the Numerous Fact-Based Threshold Factors Required to Make Determinations Regarding the Applicability of *Bivens* and/or the FTCA.**

Prisoner litigation is unique in that the incidents complained of occur in a closed, tightly controlled environment. As places of confinement, facilities generally keep the occurrences of incidents hidden from the public for security reasons, except under controlled circumstances. The information surrounding the events leading up to, during, and after instances of harm is in the complete control of any potential defendants, their colleagues, and the United States through the Department of Justice ("DOJ") and the Bureau of Prisons ("BOP"), who have strong incentive(s) to keep such information hidden. This is especially evident in instances where the victim is deceased, as is the case with Mr. Bulger, where their total informational control ensures that no one provides any details on what occurred, i.e., interviews cannot be conducted to find out information surrounding incidents, the identities of critical witnesses is not divulged, etc.

Unlike the normal civil case for injuries, before the filing of a lawsuit a prisoner's counsel cannot conduct an independent investigation upon the premises. There cannot be any visual inspection, photos, measurements, or videos. There can be no canvassing of the proverbial "neighborhood," and the identities of inmate "neighbors" or other potential witnesses are contained in housing rosters that are not available. Staff identities are likewise unavailable.

Obtaining documents pre-discovery is likewise nearly impossible without governmental approval. Although some general program statements are available on the BOP webpage, access to records regarding internal protocols, procedures, and training documents is not allowed. Post orders, in particular, are kept strictly confidential and secured at all times.[1] General program statements regarding patient care and management are available, but they note that written procedures are required under various circumstances and those procedures are not available to the public. FOIA requests are only slowly answered, disclosures made pursuant to the Act can take months, and the documents requested are subject to various exceptions and exemptions under the Act, often requiring lengthy litigation.

In the instant case, information is particularly locked down because a "criminal investigation is being conducted." Under publicly available Program Statement P5100.08, which regards the transfer(s) of inmates, there are several mandatory requirements, but the Bulger Estate's counsel has no means of obtaining critical documents regarding Mr. Bulger's specific medical review.

Without the facts that come from discovery, the trial court is left with rank speculation and the parroting of oft-repeated generalizations that often bear no relation to fact as to what actually happened. Without factual development courts

---

[1] Federal Bureau of Prisons Program Statement 5500.14 "Correctional Services Procedures Manual" https://www.bop.gov/policy/progstat/5500_014_CN-1.pdf.

are left with the comforting, albeit false, idea that policies and procedures were being followed and sometimes bad things just happen. This façade has been challenged publicly by current and former BOP officials, who find the actions of the BOP, which resulted in the death of Mr. Bulger, outrageous. Here, the trial court has been left to rely on the general proposition that the individual defendants and the DOJ and the BOP are above reproach and beyond the scrutiny of the court. And under the United States's interpretation of the facts and law, the court has had to operate in a vacuum devoid of any actual facts concerning how Mr. Bulger's stunning death occurred. The court simply has to trust the BOP in its assurances that it "did everything right."

In regard to both the *Bivens* claims and the FTCA claims, it must be remembered that this case involves an inmate with medical and psychological issues who was elderly, deteriorating, and in need of medical care, and that the individual defendants as alleged had a duty to properly assess his medical needs and take care of them. It has been alleged that BOP officials manipulated his medical status in a dramatic way to get rid of him.

But without discovery we cannot know how his placement occurred. We cannot know if any of the required medical guidelines that outline the medical criteria were followed. We cannot know what Mr. Bulger's personal medical records reveal as to what the level of his medical needs was or whether his medical

or mental health status was being addressed or even considered before, during, or after his arrival at Hazelton because the defendants have bluntly decided that we are not allowed to have them. We do not even know the names of some of the defendants who would have participated in his medical care and medical classification. Without the ability to conduct discovery, counsel cannot request and review the specific directives that address what proper procedures are designed to prevent the types of tragedies such as Mr. Bulger's care at the hands of BOP officials or muster the facts necessary to illustrate the extent to how James Bulger's death, as Cameron Lindsay, a retired warden living in Morgantown, West Virginia, stated, was "a shocking failure on multiple levels." JA 214.

Operating within the bounds of Rule 11 and with the knowledge believed to be true, it has been alleged that the defendants failed to assess those medical needs and that failure is made plain and obvious by the very fact of Mr. Bulger's placement at Hazelton. It was further alleged that they acted with deliberate indifference to the substantial risk of harm he faced, a risk so inappropriate that it appears that he was deliberately sent to his death by one or more of the defendants.

But in a classic "Catch-22" the United States has alleged that "…the estate [has not] identified any directives that 'specifically prescribe[d] a course of action for [Bureau] employee[s] to follow,' *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536), with respect to transferring Bulger to Hazelton and placing him

in the general population." Brief for Defendants-Appellees, Dkt. 18 at page 7. At the same time, they allege in their argument heading that "No directive prescribed a specific course of action to follow with respect to Bulger's transfer to Hazelton or placement in Hazelton's general population." (emphasis removed). Brief for Defendants-Appellees, Dkt. 18 at page 12. That is a bold statement that begs for factual development through discovery.

Often, when discovery is granted, bold statements such as this turn out to be untrue. But it is upon these sorts of statements that courts, keen to dispense with inmate cases, choose to base their dismissals. However, contrary to the United States's assertions, when discovery is permitted, fact-specific directives can be found. For instance, the government in *Rich* maintained that it had adhered to any and all mandates potentially relevant to the matter, an assertion made in spite of the fact that a nine-inch handmade knife, which the plaintiff was nearly killed with, somehow got into the Special Housing Unit. *See Rich*, 811 F.3d at 146. Once discovery was permitted, it became evident that the government's claim that it had followed all mandates and policy directives was inaccurate.

**Relying on the BOP's Administrative Remedy Program as a "special factor" in this matter is not appropriate.**

Looking for any means to rid itself of Mr. Bulger's complaint, the court below and the United States in their response brief express the fantastical notion that Mr. Bulger could have availed himself of the BOP's ARP and found relief

from his impending doom. The court, citing *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 523 (6th Cir. 2020), describes a process that "is substantial."

> … it contains its own statutes of limitations, filing procedures, and appeals process .... And prisoners may retain attorneys for assistance with the process. For situations determined to 'threaten[] the inmate's immediate health or welfare,' the warden must respond to a grievance within three days. 28 C.F.R. § 542.18. And by adding an administrative exhaustion requirement to the PLRA, see § 1997e(a), Congress has incorporated the ARP into its overall scheme for resolving disputes in the prison setting.

See JA 270-271, Court's Dismissal Order.

But the court below also recognizes that the ARP was not a practical alternative for Mr. Bulger, acknowledging that *even if* the BOP officials chose to bypass the lengthy procedural steps in the grievance process, often the subject of "failure to exhaust" defenses under the PLRA, even if they chose to recognize the threat to Mr. Bulger's immediate health and welfare, the Warden had *three days* to respond. JA 270. But Mr. Bulger did not even survive a full day before he was murdered—he arrived in the evening and was found dead in the morning.

Nevertheless, the United States extols the virtues of the ARP, quoting *Abbasi*, which states, "the existence of an alternative remedial structure 'alone may limit the power of the Judiciary to infer a new Bivens cause of action'" (citations omitted). Defendants-Appellees, Dkt. 18 at page 33. They also chide the Bulger Estate for not raising the availability of ARP relief in his complaint and sniffs at his counsel's assertion that inmates for security reasons are not informed of when

and where they are being sent ahead of time, which would have given Mr. Bulger scant time to avail himself of the system.

It is patently obvious that for an administrative remedial system to have any practical meaning, then it must be practically available. Otherwise, it is a cruel and cynical Potemkin village grand in appearance but illusory in reality. Determining what administrative remedies or procedures are available requires courts to look beyond what procedures are "on the books." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). The procedure provided must be "capable of use to obtain relief." *Id*. An administrative procedure is not "available" if it is a "dead end" and officers are unable or unwilling to provide any relief, if it is "opaque," making it impossible to use, or if inmates are thwarted from using it by some "machination, misrepresentation, or intimidation." *Id*. at 1859-60.

For Mr. Bulger, the APR was and will forever be unavailable. The Bulger Estate believes that the BOP had already washed their hands of dealing with Mr. Bulger's safety before he was sent to Hazelton. As Mr. Rojas put it, "[t]heir intent was to get rid of him, probably because he was a crusty old man and a pain in the ass." JA 214. Filing a grievance through the APR was an impossibility, and the BOP knew it and Mr. Bulger knew it. *Impossibilium nulla obligatio est*.

The United States's intimation that such relief may have been available and the Bulger Estate's belief that it was not is a factual dispute that can only be

resolved through discovery. Was Mr. Bulger informed he was going to be transferred to Hazelton? If so, when? Were there multiple stops along the way or was it a direct flight? Was he informed on the plane ride? At the airport? At the sallyport at Hazelton? Did he protest the decision? Were the mandatory procedures of BOP program statement §542.10 followed? Was there an informal resolution conducted under §542.13? Did staff protest or question the transfer? Did Mr. Bulger indicate that he wanted to raise the issue of his transfer and was he then threatened with retaliation? What was the discussion about his medical needs and the relaxation or lowering of his medical level before he left Coleman II? What was the process used that lowered his care level from a level 4 to a care level 2? Were the Program Statements and other mandatory protocols relating to medical care followed?  Were his medical needs and apparent disability which required a wheelchair reviewed at all before or after he arrived at Hazelton? Did he have the mental and physical ability to even "seek formal review of an issue relating to any aspect of his/her own confinement" as contemplated by BOP program statement §542.10? These and more are questions that must be answered before a court can decide whether Mr. Bulger failed to avail himself of the ARP or that the Bulger Estate failed to make such a remedy available.

It should be stated that the *Abbasi* court's comment, made in *dicta*, repeated by the trial court below in its dismissal order and again repeated by the United

States, should be moot, at least, as related to the exhaustion requirement of the PLRA. As Mr. Bulger was dead at the time his estate filed the required Standard Form 95 "Claim for Damage, Injury or Death," the failure to exhaust requirement under the PLRA simply does not apply to a lawsuit filed by a relative of a prisoner who died while incarcerated, as he would no longer be a prisoner and therefore no longer "confined."

The PLRA has been interpreted by a number of district courts in unreported opinions in this fashion. As the district court in the Western District of Virginia found when examining a lawsuit filed by a prisoner's estate after he succeeded after several attempts in committing suicide, "the plain language of the PLRA" makes it clear:

> No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. (citations omitted) and The PLRA defines "prisoner" as any person "incarcerated or detained.". Since the present action was filed following Mr. Simmons' death, he was no longer a confined prisoner at the time of filing. Therefore, the plaintiff's claims, filed on Mr. Simmons' behalf, are not subject to the PLRA's exhaustion requirement (citations to other unpublished opinions in accord omitted.)

*Simmons ex rel. Est. of Simmons v. Johnson*, No. 7:05 CV 00053, 2005 WL 2671537, at *2 (W.D. Va. Oct. 20, 2005). See, e.g., *Rivera-Quinones v. Rivera-Gonzalez*, 397 F. Supp. 2d 334 (D. Puerto Rico. 2005) (wherein the relatives of a

deceased prisoner brought a claim asserting deliberate indifference to the medical and security needs of said deceased prisoner, alleging that he was forcibly intoxicated with morphine by fellow prisoners, causing his death by overdose).

Clearly, the bare existence of an administrative remedy program that was unavailable and therefore meaningless in practical terms is merely an example of "cosmetic compliance" and should be of no consequence in determining the viability of the Bulger Estate's claims.[2]

## CONCLUSION

Therefore, Mr. William Bulger, on behalf of the Estate of James Bulger, Jr., respectfully requests that this Court reverse the trial court's judgment and enter judgment in his favor stating that his 8th Amendment *Bivens* claims are viable and thus permitting him to move forward on the same and also ruling that the discretionary function exception of the Federal Tort Claim Act does not apply to bar his claim.

In the alternative, Mr. William Bulger, on behalf of the Estate of James Bulger, Jr., asks that the Court vacate the judgment below, and remand to allow discovery to proceed so that the particular facts of this case can be developed to

---

[2] See Krawiec, K.D., *Cosmetic Compliance and the Failure of Negotiated Governance*, 81 Wash. U. L.Q. 487 (Summer 2003), describing "a growing body of evidence indicat[ing] that internal compliance structures do not deter prohibited conduct within [various corporate] firms and may largely serve a window-dressing function that provides both market legitimacy and reduced legal liability."

properly decide whether the special factors of *Ziglar v. Abbasi* are truly applicable

and whether the discretionary function exception of the FTCA should apply or not.

Respectfully submitted,

*/s/Jay T. McCamic*
Jay T. McCamic
WV Bar #2386
McCamic Law Firm, PLLC
80 12th Street, Suite 305
Wheeling, WV 26003
Ph: (304) 238-9460
fax: (304) 830-5324
jay@mccamic.com
*Counsel for William M. Bulger,*
*Administrator of the Estate of James Bulger*

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. 22-1106          **Caption:** Bulger v. Hurwitz, et al.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____4,250_____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
MS Word _____ [*identify word processing program*] in
Times New Roman, 14 point _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Jay T. McCamic _____

Party Name appellant _____

Dated: 6/10/2022 _____